IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 10-3738-TUC-RCC(HCE) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Pedro Antonio Figueroa-Burruel, | ) | |
| Defendant. | ) | |

Presently pending before the Court is Defendant's Motion To Dismiss Indictment (Doc. 15). The Government Filed a Response To Defendant's Motion To Dismiss Indictment (Doc. 25). Defendant's Motion came on for hearing on August 16 and 31, 2011. Ms. Alicia Perez (hereinafter "Ms. Perez"), Defendant's mother, and Defendant testified on August 16, 2011. ICE Officer Joseph Harvey testified for the Government on August 31, 2011. Transcript of the August 16, 2011 evidentiary hearing was filed on August 25, 2011 (Doc. 31); transcript of the August 31, 2011 evidentiary hearing was filed on September 16, 2011 (Doc. 44). Both are forwarded to the District Court for review.

Admitted into evidence are: (1) Defendant's Exhibit 1: Notice of Approval of Relative Immigrant Visa Petition; (2) Government Exhibit 21(hereinafter "Gov. Exh.__"): Form I-867-A Record of Sworn Statement In Proceedings under Section 235(b)(1) of the Act (hereinafter "Form I-867A"), dated November 8, 2005; (3) Gov. Exh. 22: Form I-867A, dated September 27, 2005; (4) Gov. Exh. 23: Form I-867A, dated August 1, 2005; (5) Gov.

Exh. 24: Form I-867A, dated July 6, 2005; (6) Gov. Exh. 25: Form I-867A, dated May 17, 2005; (7) Gov. Exh. 26: Form I-867A, dated March 9, 2003; (8) Gov. Exh. 27: In Removal Proceedings-Order of the Immigration Judge (hereinafter "Order") in A95 118 394, dated June 22, 2005; (9) Gov. Exh. 30: Order in A95 118 394, dated January 18, 2005; (10) Gov. Exh. 31: Notice to Appear/Notice to Respondent (hereinafter "Notice to Appear") in A95 118 394, dated January 6, 2005; (11) Gov. Exh. 32: Order in A95 118 394, dated May 2, 2002; (12) Gov. Exh. 35: Form I-215B Record of Sworn Statement In Affidavit Form (hereinafter "Affidavit") in A95 118 394, dated September 27, 2005; (13) Gov. Exh. 36: Affidavit in A95 118 394, dated June 6, 2005; (14) Gov. Exh. 37: Affidavit in A95 118 394, dated May 17, 2005; (15) Gov. Exh. 38: Notice to Appear in A78 046 804, dated September 9, 2000; (16) Gov. Exh. 40: Order in A78 046 804, dated September 14, 2000; and (17) Gov. Exh. 41: Form I-205 Warrant of Removal/Deportation in A78 046 804, dated September 14, 2000. The following recordings are also admitted into evidence: Gov. Exh. 29: June 22, 2005 Removal Hearing; Gov. Exh. 34: May 2, 2002 Removal Hearing; Gov. Exh. 39: September 14, 2000 Removal Hearing.

After consideration of testimony presented, exhibits admitted into evidence, and argument of respective counsel, the Magistrate Judge recommends that the District Court grant Defendant's Motion To Dismiss Indictment (Doc. 15).

# I. PROCEDURAL AND FACTUAL BACKGROUND

## A. Charge

Defendant is charged with: on or about November 23, 2010, at or near Douglas, in the District of Arizona, entering or being found in the United States of America after having been denied admission, excluded, deported, and removed therefrom at or near Nogales, Arizona on or about October 14, 2009, and not having obtained the express consent of the Attorney General or the Secretary of the Department of Homeland Security to re-apply for admission thereto, in violation of 8 U.S.C. §1326, enhanced by 8 U.S.C. §1326(b)(1). (Doc. 5).

**B.	Factual Background**

Defendant was born on August 20, 1980 in Agua Prieta, Sonora, Mexico. Defendant's mother, Ms. Perez, was born in Mexico but is a United States citizen derivatively by virtue of her father, who was born in the United States. Ms. Perez had previously filed an Application for Certificate of Citizenship on May 12, 1980, and was issued a certificate of citizenship on December 14, 1981.

In 1983, when Defendant was three years old, Ms. Perez petitioned the United States government to have Defendant admitted as a lawful permanent resident, (Ms. Alicia Perez August 16, 2011 Testimony (Doc. 31) at p. 10 (hereinafter "Ms. Perez at p. _"); Defendant's Exhibit 1). Ms. Perez was issued a card by the Immigration and Naturalization Service (hereinafter "INS")[1] for Defendant, but it was physically lost 15 years ago. (*Id.* at p.11). Ms. Perez also applied for and received a social security number for Defendant and later on, helped Defendant obtain a driver's license. (*Id.* at pp. 11-12). While living with Ms. Perez, Defendant attended public schools into high school. (*Id.* at p. 12). Ms. Perez never gave Defendant his lawful permanent resident card for fear of his losing it. (*Id.*). Ms. Perez did not feel it was necessary to tell Defendant of his permanent resident status. (*Id.* at p.13).

Defendant was arrested and detained September 9, 2000[2] by an immigration officer. (Gov. Exhs. 38, 39, 40, 41).[3] He was brought before an immigration judge on September 14, 2000. (Gov. Exh.39). At that hearing, Defendant along with other immigration detainees

---

[1] The INS is now called the Bureau of Citizenship and Immigration Services, but will be referred to as "INS" in the Report and Recommendation.

[2] Defendant was first fingerprinted by INS in April of 1999. (ICE Officer Joseph Harvey August 31, 2011 Testimony (Doc. 44) at pp. 39-40 (hereinafter "Officer Harvey at p. _")).

[3] Defendant's "A" number on file with INS is: A78 046 804. Defendant also maintains that his original "A" number when first given legal permanent residency on August 21, 1983 is A388 290 12. (Defendant's Motion To Dismiss Indictment (Doc. 15) at p. 2 (*citing* Exh. A)). Review of Defendant's Motion and Exhibit A attached thereto, and Defendant's Exh. 1, which is a copy of Exh. A, reveals no "A" number whatsoever.

1 were advised generally by the immigration judge through a Spanish interpreter that the
2 government maintains: (1) they are not citizens of the United States; (2) they are citizens of
3 another country; (3) they entered at a time and place not authorized; and (4) they were not
4 authorized to be in the United States and were here illegally. (*Id.*).

5 Defendant and the other immigration detainees were also advised generally by the
6 immigration judge through a Spanish interpreter that there are ways to avoid deportation to
7 legalize one's status in the United States. (*Id.*). One such way is if one: (1) has resided in the
8 United States for 10 continuous years; (2) has a parent who is a United States citizen; and (3)
9 has not had grave problems with the police. (*Id.*). The immigration judge asked anyone who
10 felt they fit this description to raise a hand. (*Id.*). No one raised his or her hand. (*Id.*).

11 Later on in the immigration proceedings, with use of a Spanish interpreter, Defendant
12 was specifically asked if Jose Rodriguez-Burruel was his true and correct name, to which he
13 responded "yes"; what country he was born in, to which he responded "Mexico"; whether
14 he entered the United States near Douglas on September 9, 2000, to which he responded
15 "yes"; whether he had permission from an immigration officer to be in the United States, to
16 which he responded "no". (*Id.*). The immigration judge concluded that the government's
17 charge was true and ordered Defendant's removal from the United States to Mexico. *Id.* The
18 immigration judge asked Defendant if he wanted to reserve his right to appeal, to which
19 Defendant responded "no". (*Id.*).

20 Defendant states that he first learned he was not a United States citizen in 2002 when
21 he was arrested[4] and questioned regarding where he and his mother were born. (Pedro
22 Antonio Figueroa-Burruel August 16, 2011 Testimony (Doc. 31) at p. 21 (hereinafter
23 "Figueroa-Burruel at p._")). The arresting agent informed him that because both Defendant

---

[4]Neither the Government nor Defendant proffers sufficient information regarding the context of Defendant's arrest and detention in 2002. Defendant states it was "a random stop." (Figueroa-Burruel at p. 21).

and his mother had been born in Mexico, Defendant was not a U.S. citizen (*Id.*).[5] Defendant was fingerprinted by the arresting agent but "nothing showed up. So he send [sic] me to a - - he send [sic] me to a judge in Tucson." (*Id.* at p. 22). Defendant was arrested on April 24, 2002, and charged on April 26 of 2002, with a petty offense of illegal entry in Case No. 02-po-06471-CRP-1, for which he was convicted and sentenced on April 30, 2002 to time-served. Prior to 2006, Defendant always thought he was a United States citizen. (*Id.* at p.21).

Defendant soon thereafter appeared before an immigration judge. (Figueroa-Burruel at p. 23).[6] Defendant did not advise the immigration judge that he had permission to be in the United States, or that he had a permanent resident alien card. (*Id.*). Defendant did not call his mother to say that he was in custody or that he was to appear before an immigration judge. (*Id.*). Defendant recalls being advised that he had a right to appeal the immigration judge's decision. (*Id.* at p. 24). Defendant waived his right to appeal believing that he had no status to be in the United States as the detaining agent had so informed him. (*Id.* at pp. 21, 25). Defendant states that had he known at that time that he had legal status to be in the United States, he would have appealed the immigration judge's decision to deport him. (*Id.*).

Defendant was ordered removed from the United States to Mexico on May 2, 2002 under "A" number A95 118 394. (Gov. Exh. 32). Defendant was deported through Nogales, Arizona. (Figueroa-Burruel at p. 26). People with whom he was deported provided him with a bus ticket to Agua Prieta, Sonora, Mexico, where he again entered illegally and returned to his mother's home. (*Id.*). He explained to his mother that he had been deported. (*Id.* at p. 27). Defendant's mother explained to Defendant that he was not a citizen and that she had lost the card which authorized Defendant to be in the United States. (*Id.*). After talking to his

---

[5]The Government did not provide a Record of Sworn Statement In Affidavit Form (Form I-215B) nor a Record of Sworn Statement In Proceedings Under Section 235(1) of the Act (Form (I-867A) to corroborate this interview with Defendant.

[6]Defendant appeared before an immigration judge on May 2, 2002, wherein he: (1) admitted being born in Mexico; (2) admitted entering illegally into the United States on April 24, 2002 at or near Douglas, Arizona; and (3) did not want to appeal the immigration judge's order of removal. (Gov. Exhibit 34).

mother, Defendant believed he did not have permission to be in the United States. (*Id.*).

Defendant was detained on March 9, 2003, when he presented himself at the Douglas, Arizona Port of Entry claiming to be a United States citizen. (Gov. Exh. 26). When interviewed by an immigration officer, he stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; (3) he had resided in the United States for twenty years; (4) his mother was born in Mexico; and (5) his mother was a United States citizen. (*Id.*).[7]

Defendant was arrested on or about September 4, 2004. (Figueroa-Burruel at p. 28). Defendant was charged and, on September 4, 2004, was convicted of illegal entry and sentenced to serve 4 months of incarceration in 04-po-03590-GEE-1. Defendant was served with a Notice to Appear on January 6, 2005, wherein the INS alleged that he was found in the United States at or near Douglas, Arizona, on August 20, 2004, and had not been admitted or paroled after inspection by an immigration officer. (Gov. Exh. 31). Consequently, Defendant was ordered removed from the United States to Mexico on January 18, 2005. (Gov. Exh. 30; Figueroa-Burruel at p. 28).[8]

On May 17, 2005, Defendant was detained and interviewed by an immigration officer. (Gov. Exh. 25). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; (3) he has resided in the United States "[from] time to time"; and (4) his mother is a United States citizen. (*Id.*). Defendant also informed the same immigration officer in another interview that he previously had a resident alien card that was taken away. (Gov. Exh. 37). Defendant thereafter was charged and, on May 19, 2005, was convicted of illegal entry and sentenced to a time-served sentence in 05-po-06588-CRP-1. Defendant later appeared before an immigration judge and believing that

---

[7]The Government has provided no information regarding the resolution of this contact with INS.

[8]The Government did not provide a Record of Sworn Statement In Affidavit Form (Form I-215B) nor a Record of Sworn Statement In Proceedings Under Section 235(1) of the Act (Form I-867A) to corroborate, if any, interview of Defendant by an immigration officer.

he did not have legal status to be in the United States, gave the same answers to the same questions previously asked by an immigration judge, and was ordered deported. (Figueroa-Burruel at pp. 28-29). Defendant opines that had he known that he had been granted permanent residency as a result of his mother having applied for such, he would not have waived his right to appeal. (*Id.* at p. 29).

On June 6, 2005, Defendant was detained and interviewed by an immigration officer. (Gov. Exh. 36). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; and (3) that he had a resident alien card when he "was a kid." (*Id.*). Defendant was ordered deported from the United States to Mexico on June 22, 2005. (Gov. Exh. 27).

On July 6, 2005, Defendant was detained and interviewed by an immigration officer. (Gov. Exh. 24). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; and (3) his mother is a United States citizen. (*Id.*).

On August 1, 2005, defendant was detained and interviewed by an immigration officer. (Gov. Exh. 23). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; and (3) his mother is a United States citizen. (*Id.*).

On September 27, 2005, Defendant was detained and interviewed by an immigration officer. (Gov. Exh. 35). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; (3) he previously had a resident alien card; and (4) "Just that the only reason that I keep coming back is that I do not have anyone or anything in Mexico. I have nothing in Mexico. All my family is here in the United States." (*Id.*). To the same immigration officer in another interview, Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; (3) his mother is a United States citizen; (4) he has lived in the United States since he was a year old; and (5) his mother had applied for documents allowing him to enter, remain or pass through the United States when he was a minor. (Gov. Exh.22).

On November 8, 2005, Defendant was detained and interviewed by an immigration officer. (Gov. 21). Defendant stated: (1) Agua Prieta, Sonora, Mexico as his correct place of birth; (2) August 20, 1980 as his correct date of birth; (3) his mother is a United States citizen; (4) he has lived in the United States since he was a year old; (5) his mother applied for documents allowing him to enter, remain or pass through the United States when he was a minor; and (6) his mother brought him through the port of entry when he was a year old. (*Id.*).

Defendant was subsequently charged with illegal entry in 05-po-08294-JJM-1. On November 23, 2005, by order of the Court, the complaint was dismissed.

Defendant was arrested on November 8, 2005 and charged with illegal re-entry after deportation. (CR 05-02244-TUC-DCB(JCG) (Doc. 1)). Defendant was represented by Mr. George Soltero of the Federal Public Defenders Office. On December 29, 2005, the Government, without stating a reason, moved to dismiss the indictment. (*Id.* at Doc. 8). The District Court granted the Government's motion and dismissed the indictment without prejudice. (*Id.* at Doc. 9).

Each time that Defendant entered, he was taken to an immigration judge and the order of deportation was reinstated resulting in Defendant's deportation. (Figueroa-Burruel at p. 30).

Defendant was arrested on May 15, 2006 and charged with illegal re-entry after deportation. (CR 06-01084-TUC-DCB(CRP) Doc. 1). Defendant was represented by his present counsel. Defendant's counsel filed a motion to dismiss stating that dismissal of the indictment was warranted because, *inter alia*, the order of deportation was fundamentally unfair, citing 8 U.S.C. §1326(d). (*Id.* at Doc. 12). On January 5, 2007, the Government, without stating a reason, moved to dismiss the indictment. (*Id.* at Doc. 21). The District Court granted the Government's motion and dismissed the indictment without prejudice. (*Id.* at Doc. 22). Thereafter, Defendant appeared before an immigration judge and informed the immigration judge of his legal status in the United States and did not agree to his deportation. (Figueroa-Burruel at pp. 30-31). Defendant was deported nonetheless. (*Id.* at p. 31).

## II. ANALYSIS

Defendant is presently charged with Illegal Re-entry After Deportation, in violation of 8 U.S.C. §1326. A defendant may challenge the legality of the underlying administrative removal order. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837-38 (1987). In such a criminal proceeding, to collaterally attack the validity of his removal on October 14, 2009, Defendant herein must demonstrate in the conjunctive[9], that:

> (1) [he] exhausted any administrative remedies that may have been available to seek relief against the order;
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. §1326(d).

### A. Exhaustion of Administrative Remedy

An alien is barred from collaterally attacking an underlying order of deportation "if he validly waived the right to appeal that order" during the deportation proceedings. *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000). The Ninth Circuit is also clear that the "exhaustion requirement of 8 U.S.C. §1326(d) ... 'cannot bar collateral review of a deportation proceeding when the waiver of right to an administrative appeal did not comport with due process.'" *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004)(*quoting United States v. Muro-Inclan*, 249 F.3d 1180, 1182 (9th Cir. 2001)). Where a defendant's waiver of the right to appeal a removal order does not comport with due process, the defendant is exempted from the exhaustion requirement of section 1326(d)(1). *Id.* at 1050. Indeed, "[a] waiver of the right to appeal a removal order does not comport with due process when it is not 'considered and intelligent.'" *Id.*

> Such a waiver is not "considered and intelligent" when the "record contains an inference that the petitioner is eligible for relief from deportation, but the Immigration Judge fails to "advise the alien of this possibility and give him the opportunity to develop the issue."

---

[9]A defendant must satisfy all three requirements in order to prevail. *See United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2nd Cir. 2002).

*Muro-Inclan,* 249 F.3d at 1182 *(citing* Arrieta, 224 F.3d at 1079 (*quoting Moran-Enruquez v. INS* 884 F.2d 420, 422023 (9th Cir. 1989))).

A combination of factors led to depriving Defendant the process he was due. Since the onset of Defendant's first contact with the immigration court in 2000, the record is replete with the consistent failure of INS to properly discern Defendant's eligibility for relief from deportation and to inform him of such.

First, when Defendant was accorded legal residency at the age of three in 1983, he was assigned an "A" number by INS. Defendant provided INS immigration officers with personal data that would place INS on notice of Defendant's previous lawful presence in the United States. Defendant was eventually assigned a second "A" number which was not consolidated with Defendant's earlier assigned "A" number until some later time. (Officer Harvey at pp. 67-68). Second, this Court can reasonably assume that INS, like any federal law enforcement agency, properly obtained Defendant's fingerprints in their encounters with Defendant. (*See* Officer Harvey at pp. 37-40). Yet, at no time with this information did INS cobble together Defendant's "A" numbers on file or prior contacts with INS and information provided to and obtained by INS. Third, information provided to and obtained by INS indicates an array of facts that would apprise an immigration officer as well as an immigration judge that Defendant may have a plausible claim to relief from deportation: his place of birth, his date of birth, he had resided in the United States, his mother is a United States Citizen, and he previously had a resident alien card.

Despite this information, both the interviewing immigration officer and the immigration judge focused on the narrow basis for Defendant's deportation: he was born in Mexico and he did not have authorization to be in the United States at the time he was detained.

> Aliens, even aliens whose presence in this country is unlawful, have long been recognized as "persons" guaranteed due process of law by the Fifth and Fourteenth Amendments.

*Phyler v. Doe*, 457 U.S. 202, 210 (1982). Affidavits and/or Form I-867A's, completed by an immigration officer in his or her contact with Defendant, containing the above-enumerated

information, were undoubtedly forwarded or made available as part of the record to the immigration judges presiding at Defendant's hearings. It would not have been burdensome for INS to marshal and marry this information to determine Defendant's status in the United States.

> Because aliens appearing pro se often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the I[mmigration] J[udge] "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."

*Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002)(*citing Jacinto v. INS*, 208 F.3d 725, 733 (9th Cir. 2000) (*quoting Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985))).

The immigration judge is authorized to administer oaths, receive evidence, and to interrogate, examine, and cross-examine the alien and any witnesses under 8 U.S.C. §1229a(b)(1). However, as an administrative law judge, the immigration judge "acts as an examiner charged with developing the facts." *Richardson v. Perales*, 402 U.S. 389, 410 (1971). The immigration judge's failure to develop the record compounded Defendant's inability to make a "considered and intelligent" decision to waive his right to appeal his deportation.

### **B.    Denial of Judicial Review**

A non-United States citizen may petition the Ninth Circuit Court of Appeals for judicial review within 30 calendar days from the date of the Final Administrative Removal Order. 8 U.S.C. §1252(b)(1); *see Flores-Ledezma v. Gonzales*, 415 F.3d 375 (5th Cir.2005).

Title 8 U.S.C. §1252 provides, in pertinent part, for the exclusive means of review:

> Notwithstanding any other provision of law (statutory or non-statutory), ... , *a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review* of an order of removal entered or issued under any provision of this chapter, ....

8 U.S.C. §1252(a)(5)(emphasis added). Title 8 U.S.C. §1252 further provides that:

> Nothing in [the provisions that limit or eliminate judicial review] ... shall be construed as precluding review of constitutional claims or questions of law raised upon a petition

for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. §1252(a)(2)(D).

The Government maintains that Defendant is:

> *In general.* An alien present in the United States without being admitted or paroled, or who arrive[d] in the United States at any time or place other than as designated by the Attorney General, [and] is inadmissible.

8 U.S.C. §1182(a)(6)(A)(i)(emphasis added). Furthermore:

> In general. Any alien who falsely represents, or has falsely represented, himself ... to be a citizen of the United States for any purpose or benefit under this chapter ... is inadmissible.

8 U.S.C. §1182(a)(6)(C)(ii)(I). However:

> *Exception.* In the case of an alien making a representation described in subclause (I), if each natural parent of the alien ... is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

8 U.S.C. §1182(a)(6)(C)(ii)(II)(emphasis added). Defendant's personal life circumstances reasonably appear to track the requirements of the above-described exception. Defendant testified that he has always thought he was a citizen of the United States, and in fact asserted as much on March 9, 2003 when he presented himself at the Douglas Port of Entry.

As set forth *supra*, at I.A., where the record contains an inference that the defendant is eligible for relief from deportation, the immigration judge must advise him of this possibility and give him an opportunity to develop the record. In such a case, the failure to advise the defendant of his right to apply for relief from deportation constitutes a due process violation that deprives the defendant of judicial review because "an alien who is not made aware that he has a right to seek relief necessarily has no meaningful opportunity to appeal the fact that he was not advised of that right." *Arrieta*, 224 F.3d at 1079; *see also United States v. Ortiz-Lopez*, 385 F.3d 1202, 1204 n.2 (9th Cir. 2004).

Despite ample information regarding Defendant's status in the United States provided

1 or made available to the immigration judge, which gave notice that Defendant may arguably
2 have relief from deportation, the immigration judge in each instance was affixed to only
3 those allegations which supported Defendant's deportation. Although Defendant was advised
4 of his right to seek judicial review, which he invariably waived, the failure to inform him of
5 his eligibility for relief from deportation rendered such waiver invalid.

### C. Fundamental Unfairness

Defendant must demonstrate conjunctively that: (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects. *United States v. Zarate-Martinez*, 133 F.3d 1194, 1197 (9th Cir. 1998), *overruled on other grounds as discussed in United States v. Ballesteros-Ruiz*, 319 F.3d 1101, 1105 (9th Cir. 2003). As set forth *supra*, at II.A. and II.B. Defendant has demonstrated a due process violation in the underlying removal proceeding.

To establish prejudice, Defendant need not show that he actually would have been granted relief. *Ubaldo-Figueroa*, 364 F.3d at 1050. Instead, he must only show that he has a "plausible" ground for relief from deportation. *Id.*

Defendant was a legal permanent resident. In order to rescind such status, INS must comply with mandatory procedures. The regulations state that INS must commence rescission proceedings by serving notice of intention to rescind containing specific allegations against a resident alien. 8 C.F.R. §246.1. This notice must also inform the resident alien of the right to submit within thirty days from the date of service of the notice, an answer in writing under oath setting forth reasons why such rescission shall not be made and to request a hearing before an immigration judge wherein evidence may be presented relevant to why the rescission should not be ordered. *Id.*

INS may parole an alien pending inspection "for urgent humanitarian reasons" or "significant public benefit," provided the alien presents neither a security risk nor a risk of absconding. 8 C.F.R. §212.5(b). In making this determination, INS can look to community ties, such as close relatives with known addresses. 8 C.F.R. §212.5(d)(2). Defendant had and continues to have substantial ties to the community: his U.S. citizen mother with whom he

1 | has resided since the age of three.

> It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, ... [h]e may not be deprived of his life, liberty or property without due process of law.

*Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953).

The Government maintains that Defendant is inadmissible because he was neither admitted nor paroled into the United States, having arrived at a time or place other than as designated by the Attorney General. *See* 8 U.S.C. §1182(a)(6)(A)(i). However, Defendant

> was entitled to U.S. citizenship, along with its rights and privileges from the moment of birth, not upon the issuance of a certificate of citizenship or any other formal determination by the INS or any government official.

*United States v. Smith-Baltiher*, 424 F.3d 913, 920-21 (9th Cir. 2005); *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1092-94 (9th Cir. 2005)(8 U.S.C. §1401(g) provides for citizenship at birth).

On the instant record, the immigration judge did not properly develop the record, resulting in rescission of Defendant's legal immigration status by an improper procedure. Had the record been properly established[10] by the immigration judge, it is reasonably likely that Defendant would have requested a hearing to contest his removal and deportation. Had such hearing resulted in an order of removal and deportation, it is reasonably likely that Defendant would have appealed and established a plausible ground for relief from deportation: he was either a legal permanent resident having resided in the United States for over 20 years with his U.S. citizen mother or a derivative U.S. citizen. The prejudice suffered by Defendant is self-evident: the defective *a priori* September 14, 2000 order of deportation resulting in serial orders of deportation, including the October 14, 2009 order of deportation

---

[10]INS maintains systems that can be tracked by fingerprints, or event numbers based on contacts with INS. (Officer Harvey at pp. 37-38). Defendant has been fingerprinted approximately 46 times since 1999. (*Id.* at pp. 39-40). INS linked Defendant's September 1995 A78 046 804 and April 29, 2002 A95 118 394 files by his fingerprints taken in those respective files. (*Id.* at pp. 66-67).

relied on herein by the Government.

### III. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District grant Defendant's Motion to Dismiss Indictment (Doc. 15).

Pursuant to 28 U.S.C. §636(b), Rule 59 of the Federal Rules of Criminal Procedure, LRCrim 12.1 and LRCiv 7.2(e), any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 10-3738-TUC-RCC.**

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 7th day of October, 2011.

_____
Héctor C. Estrada
United States Magistrate Judge